Texas Association of Money Services Businesses, et al. v. Pamela Bondi, et al. We'll first hear from Simon Jerome from the Department of Justice. Good afternoon and thank you. Your Honors, may it please the Court, Simon Jerome for the Government. I'd like to reserve three minutes for my rebuttal, if I could please. The Bank Secrecy Act permits the Financial Crimes Enforcement Network, or FINCEN, to impose time-limited reporting requirements on financial institutions as necessary to address emergent money laundering concerns. FINCEN properly exercised that authority here to gather information about money laundering or potential money laundering at the southwest border that may be connected to fentanyl trafficking. The Court's leave, I'll address the Fourth Amendment interests of the businesses first. Before you do that, how does the impact of the timing of this, can you explain to us why this is not moved and what is the subsequent order, how does that play into this? Yes, Your Honor. So the relevant statute, which is Section 5326A, has a maximum duration of 180 days. When this order was promulgated, when it was published in the Federal Register and went into effect in April, it had a five-month duration. And so that means it expired on September 9th. Subsequently, FINCEN reissued a GTO on largely similar, according to largely similar parameters with some important differences. I will say the merits of that order, the subsequent order, I don't understand to be before the Court and I understand the parties to agree that what is before the Court is the preliminary injunction as to the prior GTO. And this needs to be capable of repetition, evading review, and so we need to decide this one. That's our stance, Your Honor, the government's stance. I do understand my friend on the other side to take a bit of a different tack and to argue that because the preliminary injunction applies of its own force to the new order, that the dispute is not moot. I think that overcomplicates things and also is incorrect, I think. It will not move either way, though. Yes, Your Honor. Yes, Your Honor. That's right. I just, you know, I think it's in our institutional interest to draw a line. The PI specifically refers to the March 2025 order. That's correct. For mootness purposes, Your Honor, I would agree. And so, you know, I think it's exactly that reason. When do we need to rule on this, given the circumstances? How urgently do we need to rule? Your Honor, I don't understand there to be a— the government is not requesting a particular decision by a particular time. It's uncontested that the order that the PI was issued against has expired, and so I think in the ordinary course— The order has expired. Yes, Your Honor. It was enjoined the entire time. With respect— Go ahead. I'm sorry. I apologize. This injunction was plaintiff-specific, and so the order was, in effect, in particular places. That's right, and there was an injunction separately entered in the Ninth Circuit litigation, and so, in effect, when you add the preliminary injunctions up, this order that is under review was, in effect, as to certain plaintiffs in Texas only for the period. If this were to not work for you, and I'm not foreshadowing, would we need to quickly issue an order because some people are caught up in this and not excluded in the order, or does it not matter because this has expired anyway? The latter is our view, Your Honor, that there's no urgency to a decision. I think we certainly requested expedited briefing to have guidance in a shorter time frame that might otherwise be the case, but there are no exigencies apart from that consideration. I think you wanted to begin with the Fourth Amendment, and there's no issue on standing in this case, correct, or ripeness or any of these other disabilities. No, Your Honor. So you wanted to begin with the Fourth Amendment. I do hope that you will at some point discuss whether it's— if you did notice a comment related. Yes, Your Honor. With respect to the plaintiff business's Fourth Amendment interests, it's our view that this case is determined by Schultz, the Supreme Court's decision in California Bankers Association versus Schultz. Indeed, in almost all relevant respects, that case is on all fours. We accept $10,000 versus $200? That's the important exception, Your Honor. That's important, isn't it? Well, I'll start there, Your Honor. Okay. So, you know, there certainly is a line in the Supreme Court's analysis that says there's a tenable congressional determination with respect to abnormally large transactions. What I take that to mean, Your Honor, is that Congress looked— it's important to note Congress did not, in fact, set the $10,000 limit itself. Congress empowered the Secretary to do that, empowered FinCEN to do that. And so there is this view Congress has made a determination that certain— let's call them large transactions are a potential source of abuse, you know, that there might be money laundering going on there. Separately, Congress made a determination and indeed has expanded an authority several times over for the Treasury Department— it's delegated those powers to FinCEN— to impose additional reporting requirements. In other words, there is a congressional determination that FinCEN is in a good position to judge when additional reporting requirements are necessary and to do so here. What if it was a dollar? In terms of the Fourth Amendment analysis? So, you know, I think the same would be true. I think insofar as the question is what does it mean that this language, abnormally large transaction, appeared, I think it's— Are we saying that the Fourth Amendment applies to this because this is a search in some real sense? We haven't disputed that businesses have— Okay, so the Fourth Amendment applies, and so we'd have to look at the reasonableness of the limit. And in Schultz it was, well, these are large transactions, so reasonably one might be kind of suspicious about these large transactions. We've lowered it by—my math is not good, but let's say, you know, 4,000 percent or something, very, very a lot. So why isn't the simple answer that, well, gosh, now it's not reasonable anymore because what it looks like is a phishing expedition to say, well, let's get a lot of information. And then if we sift through all of that, then we might be able to uncover some more money laundering. I think the reason, Your Honor, is because in addition to saying abnormally large, the Court said a lot of other things, too. It said there is an important governmental interest here in combating money laundering. That is exactly the same here, indeed. That interest is even stronger given the nexus to international drug trafficking and the fentanyl crisis in the United States. Schultz also said the businesses inherently, by virtue of their status under U.S. law, have diminished interest. That is identical here. Indeed, we would submit that this bleeds—what I'm about to say bleeds in a little bit to burden, but these businesses have— Yeah, I don't doubt anything you're saying, but I take it that the government— what I hear you saying is that there's no lower limit on what the Treasury Department could say is a threshold for the money transaction. I don't mean to say that, Your Honor. I do think certainly reasonableness, there's an inherent fuzziness there. I do think what— How are we—we're supposed to review that. So how are we supposed to review it in this particular case, $200? I think we look at how many similarities there are with Schultz and sort of assess the purposes for which the order was put into effect. I certainly, being a rules person myself, sometimes I wish there were more bright-line rules. I think happily— Well, the Fourth Amendment is often. Yes, Your Honor. And happily, we have—I'm sorry. No, it's— Happily, we have very good guidance from the Supreme Court in Schultz. Is there anything in the record that would highlight why $200 is a good threshold for this rule? Anything that demonstrates that money laundering or drug trafficking or what have you, especially in this location, is being done in denominations, that $200 would be a meaningful threshold? Or we just should trust that—you've said several times already, Congress has given you the authority. Should we just accept that, or have you put any evidence in the record? So I'll say two things, if I can, Your Honor. Insofar as your question relates to the Fourth Amendment inquiry, I think it's enough to say that this is a sort of a reasonable measure to gather information related to a strong government interest. Insofar as your question relates to was it arbitrary and capricious, which is one of the issues that's arisen in this case, I think it's really important here—Your Honor's question raises a good point, which is if you accept plaintiff's framing, the idea is everything that's turned up— let me say this, let me back up. Plaintiffs analogize to the ordinary search, and in a lot of Fourth Amendment cases we're used to thinking you need probable cause because you need to go in and you're going to find something that looks criminal, right? This is not that. And in fact, Schultz says that when it says there's a line about if the government had no basis other than official curiosity, it is okay for the government to ask for reporting on a broad basis to satisfy itself that the laws are being followed. And so that's not the right question, Your Honor, I think, including under the APA, because under the APA, what we look to—and this is, again, pivoting a bit to arbitrary and capricious review— is there a rational reason for the step the government took? The government said, FinCEN said in the evidentiary memorandum, it has a lot of information that is of concern to it. We know there is Mexican cartel involvement in the fentanyl trade. We know that money transfers are an important part of—are the lifeblood of that exchange. We know that the money services businesses generally exhibit some concerning vulnerabilities to money laundering and potentially with respect to money laundering connected to the fentanyl trafficking crisis. From there, the agency said we want to gather a broad-based snapshot, to use the term in the evidentiary memo, of what's going on. That does not mean the agency thought or there's any reason to expect that everything it gathered would be criminal in nature, or when I say criminal, connected to a crime in some way. There's no reason to think that. But that's— I don't think any of it would be connected to a crime. That's right, Your Honor. And I don't think that— I don't think it's connected to a crime. It's just randomly picking certain places and certain zip codes. And I don't know that that's a friendly question. So that's the problem. It's not friendly. So, Your Honor, I take some issue with the idea that it was at random, right? And so I think that there are— There are those five minutes away that are not picked zip codes. Certainly, Your Honor. But I don't think the fact that a tool inherently has some weaknesses built into it means that it's arbitrary for the agency to use that tool. And so, you know, the confidentiality point is a separate one. But this raises the idea that often this tool, that it was sort of arbitrary in some way for the agency to use a tool that is traditionally used on a more targeted basis. Well, certainly there are drawbacks to doing larger-scale collection of information. But doing so is not arbitrary in the APA sense. It just means there are certain drawbacks. And, indeed, the evidentiary memorandum says that the agency will monitor to see if evasion is going on and will take steps to account for that. I don't know if that's true. Or maybe we don't look behind the clock here. We understand that there's some indication in the record that the agency can't even monitor the $10,000 ones, that they don't have any resources to monitor the $10,000 ones. So how are they going to monitor thousands and thousands and thousands of the $200 ones? Is it because they have a new AI system or something? How is this happening? So, Your Honor, I think in the record, there is an analytic plan that is redacted for law enforcement reasons. The agency has said it believes that this information could be useful if properly processed. I think the comparison to the $10,000 CTR is apples and oranges or apples and a fruit closer to apples. One is statutory and one is not. That's right, Your Honor. So I'll get to notice and comment in a second if that's all right. But I'll just say that there's no sort of inconsistency in saying there is this generally applicable requirement that gives us perhaps something useful and otherwise far more than we need, which I take the agency to have said at a certain point in time. And separately, there is this unique geographically limited emergent concern, and we would like to look into those reports that we get out of this particular place and time. I don't think there's an inconsistency there, and I think otherwise there's a presumption of regularity and the thought that the agency will use the information it gathers. Should we be doing these steps in any particular order, Fourth Amendment, arbitrary and capricious, whether it's a rule, whether it's ultra-virus, whether it's non-delegation? Should we be doing these in any particular order? I don't think so, Your Honor. Why can we only do the ones that the district court ruled on? So the plaintiffs have raised the ultra-virus arguments as an alternative ground and basis of affirmance. I think if you were to decide for us on the other grounds, you would be required to address those arguments. I'd— Why would they hold them off? Yes, Your Honor, because these separate grounds are independent grounds for relief. But, you know, I think the ultra-virus arguments, for what it's worth, I think largely can be collapsed into the notice-comment dispute. I think with the exception of the major questions doctrine, we are talking about the same thing when it—either this is a rule—well, so let me back up. The statute says treasury can promulgate an order. We read that not to cabin the agency, but to say if the other statutory terms, and the one that's disputed here is a group of—I'll say businesses. It actually says domestic financial institutions or non-financial. Putting that to the side, businesses. If the other criteria of the statute are met, what results as an order is our view. Plaintiffs' view, I understand it to be that by saying order, what Congress meant to do was cabin. You apply the rule-order test from the rest of the court's law, and, you know, the court's precedent interpreting the APA, and— You're saying this is not an order. That's right. This is not an order. It's not specific businesses. It's zip codes, and, you know, it looks like a rule. That's right. I think first and foremost, understanding what Congress was trying to do when it put this authority into law, it makes sense to interpret this to be flexible and to be able to be deployed. And what case says that, that we can do that? Your Honor, I think it's just, you know, I think it's pretty straightforward textualism. I don't know that there's a case specifically, but I think— It says this can kind of be somewhere in between an order and a rule, and therefore there's no notice in common in the ruling of the court. What case is that? Well, W.H. Hodges, which we've cited in our briefing, is a decision from this court from 1976 that says an investigatory order is not subject to rulemaking. But that was investigatory, and this is not. This is more broad than that. It doesn't have any—as Judge Duncan had said in his question, this doesn't have any particularized people in it. So— It's not an investigatory tool that you use usually as a backup for other tools after you've had an informant or whatever. I disagree, Your Honor. I think that sort of puts a gloss on investigatory that isn't necessarily appropriate. I mean, here I think it is conceitedly a broad-based investigation, but it is designed to generate information of use to the government in combating this problem. An investigation not targeting anyone. That's right, Your Honor. Not any— Not targeting the concept. Look, it's real. I get it. I don't think anybody's questioning that it's real. It's a problem, a serious problem. The question is, how does this fit within the APA? Was there a shift in the rationale when you go from the old one to the new one that would require notice and comment? I know you say no, but wouldn't it make sense to say we need more input from the public on this because we're really making a shift from what was a fairly targeted thing before to something that's far more broad-based? What's your reaction? When you say from the old to the new, you don't— It's the $10,000. I'm sorry? The $10,000 threshold. I see. So just to clarify, both of those requirements are in effect. So they're separate. This did not— No, I get it. You're right. That's right. So, you know, I think that there is no—this is conceitedly in the general way of thinking about rules versus orders, a sort of odd beast. I do think W.H. Hodges answers that question. I think if you look, Your Honor, and I see I'm approaching the end of my time. If I could finish. You have two more minutes because you said you wanted three minutes of rebuttal instead of five. So you have two more minutes, and then we're going to give you two more minutes and give the other side two more minutes because we have a lot of questions. Thank you, Your Honor. You should have four minutes at this point. Thank you, Your Honor. I do think even applying this court's—well, let me say, one last textual clue is when we look at the APA's definition of rule at 5 U.S.C. 551.4, what we see is a general statement of—a statement of general applicability, general or particular applicability, but the thrust is designed to shape behavior in a particular way, designed to implement law or policy, I believe is the language of the statute. I think it's unquestionable that here the intent is not to prescribe law or policy. You could quibble with whether prescribe law means impose a reporting requirement, but yes, it does that. But the idea is that it's not to shape conduct. It's not to achieve a policy outcome. It's to gather information. It's to do something other than what we conventionally think of as rulemaking, and the default under the APA is if it's not a rule, order is the catch-all, and so we think it falls into that category. Why isn't this like the fishing cases where you're putting all these people out of business and nobody's even worrying about that? You know, all the cases where they had to put all that technology on the ships or they had to hire a person to ride along with them. Why isn't that this case? Because this is so expensive that none of these small businesses, these mom-and-pop kind of businesses, and that's not in any derogatory way, are all going to go out of business because they're tiny places that don't have giant computer systems like the big banks. Your Honor, I think it's important to stress we've not taken issue, and I don't take issue now with the factual findings the district court made, but it is important to stress the limits of this record. There are ten plaintiff businesses. In the interest of candor, I'll say the district court judge ordered that no new plaintiffs be added, so I can't say that is the other side's choice, but all this to say the record that's before the court is ten businesses, and I'm not downplaying the burdens certainly that they expressed at the hearings. I do want to say when we consider the effect of the rule as a whole on all of the businesses and the targeted zip codes, the burdens vary pretty tremendously, I would think, from business to business, or they would have to, right, because businesses have different levels of resources and different capabilities. I would add there was also testimony adduced that in response to a question from the government in the district court proceedings, one of the plaintiff's witnesses acknowledged the existence of software that can ease the burden. I don't mean that. I'm sorry. I think it costs either $5,000 to $8,000 total, or else if you look at these other opinions from these other places, the one in California says it costs that much a month, over $3,000 a month to use the software. So plus you have to have somebody who knows how to use software. You have to hire somebody on this border town who knows how to use it, and I'm not saying there aren't really smart computer scientists there, but you've got to hire somebody who works at this business to run the computer system, and it costs either an installation cost of $5,000 to $8,000, and then maybe $3,000 a month. And even the Wal-Mart says they're putting up a sign that says we're not going to do any over $200. So they've made the business decision that they can't even afford to do it, and they're Wal-Mart, or they don't want to cool with it. So what does this tell us? I think, Your Honor, it tells us, again, that I think we don't dispute the burdens that were testified to in the district court and that the district court accepted. I think what's important, again, is as in terms of the Wal-Mart is not even doing it. I may be missing something, Your Honor. I don't recall that. But they're not doing it. It's too much trouble. It's too hard. I think I would be hesitant to extrapolate too much from the lesson of one business. One business might have decided it's not in our interest to do this for the limited duration of the order. That's the other point I would get to about the burden, is that any burden imposed on businesses as a virtue of this is inherently time-limited. Yes, they can be renewed, and this one was renewed. I think it's important to mention, although the merits of this order are not judged by the subsequent order, the subsequent GTO sets... Well, so I was just going to say, Your Honor, the subsequent order sets a threshold of 1,000, which I, again, the merits of that order are not before the court, but I suspect will pose sort of, I anticipate will pose very different burdens, if any, approaching the same degree. The last thing I'd say, Your Honor, is that if I could, I know I'm still quite over, but just on burdens, if I could say quickly that I think it's important that plaintiffs, while they could not have anticipated this particular order taking effect, what they did is they registered to participate in a very regulated, in a very complicated regulatory framework. Plaintiffs themselves acknowledge that they have anti-money laundering sort of framework in place, that it cannot come as too much of a surprise that there might be other burdens related to government regulation in the future. When you come back, can you talk about vacature? Because there is some who believe that vacature is the remedy in the Fifth Circuit for these types of APA violations, if we were to be defined on it. Yes, Your Honor, I'm happy to do that. If there are no further questions at this time, I'll go ahead and sit down. Thank you. Good afternoon, Your Honors. Robert Johnson from the Institute for Justice on behalf of the Plaintiff Money Service Businesses. The plaintiffs here are small family businesses, in many cases, multi-generation family businesses that provide financial services to ordinary people, many of whom don't have bank accounts. And these businesses overnight were subjected to crushing compliance burdens, all in service of a government fishing expedition that is a consummate general warrant. Mr. Johnson, on the Fourth Amendment question, Mr. Jerome quoted some language from Schultz, California Bankers Association v. Schultz, that I'd like your reaction to. I think they're quoting an earlier case here, but it says, even if one were to regard the request for information, in this case, as caused by nothing more than official curiosity, nevertheless law enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest. Does that mean that the Fourth Amendment analysis here is basically, well, we understand why the government wants to know these things. I've already suggested that, obviously, fentanyl trafficking and money laundering is a serious problem. Why isn't that enough to say that this isn't a Fourth Amendment violation? So I think you have to read that in connection with the rest of the decision. And the Court also said that the information, it was important to the Court that the information was sufficiently described and limited in nature. So the Court has said that, you know, so the $10,000, for instance, there's not, you know, the fact that someone does a $10,000 transaction, that doesn't give rise to probable cause or reasonable suspicion, but the Court in Schultz still said that that could be required, so the standard's not reasonable suspicion, at least for that type of reporting. But there is still some standard, and what the Court said, it has to be reasonable, it has to be sufficiently described and limited in nature, it can't be so overbroad that it becomes unduly burdensome. And so there are, you know, there's a standard that I think looks to the degree of particularity, to the government's interest and the relationship between the amount that's being required and the government's interest, and to the burdens on the businesses. To remove the drastic difference in the numbers, let's just say the government decided they would benefit from lowering the $10,000 to $7,000. What do you contend the government needed to do and would need to do, I should say, in order to make that change? So I think there would need to be some sort of evidence of a significant problem of money laundering at the $7,000 level and some sort of basis for the government to come forward and say, hey, at the $7,000 level there's a lot of transactions that are going to be coming up that are— We were missing something at the $10,000 level, we need to lower it. Exactly, exactly. And I think it's significant that the $10,000 level in the 1970s was over $70,000 adjusted for inflation. So, you know, it really was, we're talking about very large, essentially, you know, briefcases full of cash. And the Supreme Court in Shultz viewed that as very different from, you know, sort of everyday cash transaction. And then, of course, we have the concurrence from justices, I believe it's Powell and Blackman, who, you know, say it would be a very different matter if this was a lower, a different cash transaction threshold. So, you know, I think the opinion is fairly clear about that. It's, you know, I also think there are other differences between Shultz and this case. And I think one of the important ones is that Shultz was dealing with a nationwide transaction threshold that was for, you know, essentially every bank, whereas here this is more targeted. And I think the combination of it being both suspicionless and targeted is a very troubling combination because it gives the government discretion to essentially say, we're going to require this from this group of people, but not this group of people. You know, it's a lot like the Supreme Court's decision just a few months ago in United States v. Wilson, where there was a suggestion that you could have suspicionless searches of gun owners. And what the court said in Wilson was there's, quote, So I think the combination of it being both suspicionless, not particularized, but also targeted at a particular county or particular zip codes and particular types of businesses, that's something that under the Fourth Amendment is extremely troubling and makes it a general warrant. So what if we have fabulous data analytics systems and we can do the whole country, and we can do it for any amount? So I think that then takes us back to the first part of Shultz, that surely there is some limit to what the government can require, just if the theory is, if we ask for every information about every transaction and we're going to have this super AI that's going to analyze all of it, I think it's, you know, the government can't ask for everything just because they're going to find something. And I think that's essentially the government's theory here is for these counties, we're going to ask for everything and then try to find something. And that's just not how the Fourth Amendment works. And I don't think Shultz suggests that it is how it works. I think Shultz is dealing with a much more targeted request. And Shultz, I think, draws that language about official curiosity. I believe that's from Morton Salt. And Morton Salt was a much more targeted request at particular companies that were actually the subject of an FTC compliance decree. And the point of the information request was to see if they were engaging in the same thing that had led to the FTC compliance decree. So the FTC said, hey, we need information from you to tell if you're complying with this decree. And the Supreme Court upheld that, and it was very targeted to particular companies in connection with a particular investigation of a particular thing that these companies had actually, you know, been engaged in in the past. So in the court, I think, you know, there it said that that was constitutional, but that it said a request for information could be, quote, of such a sweeping nature and so unrelated to the matter properly under inquiry that it would violate the Fourth Amendment. So, again, the court there recognized there are limits to what can be asked for. What's the status of the other cases challenging the GTOs? Where are we on those? Yes. So the case in the Ninth Circuit, the district court proceedings have been stayed pending appeal. The government has appealed the preliminary injunction to the Ninth Circuit, and that's tentatively scheduled for oral argument in February or March. At the same time, there's a parallel case to this in the San Antonio district court, and that case has not been stayed in the district court. The government has appealed the preliminary injunction in that case. The appeal in the preliminary injunction in that case, the Voluta case, has been stayed pending this appeal by the Fifth Circuit. Oh, I'm sorry. That's the El Paso case. I said San Antonio. Yeah. Yeah. Yeah. I apologize. And then, you know, I should say this case has been stayed in the district court over our objections pending this appeal. And I think that's relevant to the question of urgency. We don't have urgency in the sense of the preliminary injunction is in place, but we do have urgency in the sense that we would like to bring this case to a final judgment, and the case has been stayed in the district court pending this appeal. So, you know, on the question of urgency on our end, you know, there are businesses across Texas that are still having to comply with this. It's very burdensome. It's burdensome even at the $1,000 level for a number of reasons. You know, we still have thousands of transactions, many of these businesses, thousands of transactions. That would be the revised? Yes. Yes. Well, I agree. I agree, Your Honor. I just want to explain that it's important for we're basically in the situation where all of the challenges to the revised order at the district court level are waiting for this appeal to be concluded. And so. But it's stayed everywhere at the $1,000 level. No. Well, it's not. So the stays are all party limited. And so every injunction, well, the injunction in California is for every business in California. But both of the Texas injunctions are party limited. It's not because you asked for that injunction. You literally asked for the injunction. But then you heard Alan from GTO. You mandated under 706. So are you asking for backer or injunction? We. What's happening? So, you know, I think that after the decision in CASA that the distinction between 705 relief under the APA and injunctive relief has become very important. But at the time, CASA had not yet been decided. And, you know, the binding law, which is still the binding law, was career colleges. And career colleges had held that in a case under the APA, an injunction should not be party limited because the APA provides for vocateur and Section 705 provides for stay of the agency action. And so, you know, what we were asking for, and I think it was very clear what we were asking for, was for relief to stop the enforcement of this agency action at the preliminary stage of the litigation for everyone, not just for our parties. And we were very clear about that. And we cited 705. We cited 706 of the APA. We were very clear that we were asking for that type of non-party restricted relief. That's not correct for vacature under APA relief? No, but what CASA says is that for injunctive relief. Yeah, but if it's APA, if it's for, if it's arbitrary and capricious, assume argument that it's arbitrary and capricious, what's the correct result under the current Supreme Court understanding? To issue under 705 to stay the effective date of the agency action and under 706 to vacate the agency action. And absolutely, CASA does not disturb that in any sense. I just, all I'm going to suggest is that the terminology that we used, I think, reflected a sort of pre-CASA. Do you believe that we should, like, do we need to address all of these arbitrary and capricious, whether it's a rule, whether it's ultra-virus, whether it's non-delegation, whether it's Fourth Amendment, do we need to address all of these? I think the court should, Your Honor. Well, that's fair, Your Honor, but, you know, obviously the court can affirm on any ground. Right. You know, I would, I think. So we need to pick one, if you, I mean, I'm not saying that you prevail on it, but if you were to prevail, you would just need one, right? We do just need one. You know, obviously in jarczy, for instance, this court had multiple possible grounds that it could rule on the court. Being in jarczy, you didn't go through the whole list. I think you picked three of the possible four or five. That's fair. That's fair, Your Honor. Is there a constitutional avoidance issue in play here where we should go into the APA and not reach the Fourth Amendment? So, you know, I think the court could do that, and I think actually we've argued that, you know, one reason to interpret the statute for our ultra virus argument, one reason to interpret it in the manner that we have proposed is that it at least somewhat ameliorates the constitutional issues. You know, so I think the court certainly has that option available to it. I don't know that the court has to do that. Moving on the ultra virus argument, is that right? Well, so I don't know if it's a cross. We did cross appeal, but I don't know if we if that we needed to cross appeal on that because it would just affirm the judgment. But we did ask for more relief. So maybe who knows? Yeah. So what what is that? Would you go through that argument, please? Yeah, absolutely. And so and I would say that I think if the court looks at the opinion from the California case, Nova Dades, Judge San Martino, agreed with the ultra virus argument. So that really sets it out. You know, and obviously we set it out in our briefs. But the statute here provides that FinCEN may issue an order and it has to be directed to a business or a group of businesses. And then it has to be based on a finding of reasonable grounds that these reports are necessary. And so the question really is, is does that statute anticipate that FinCEN is going to be making this determination about necessity, looking at a particular business or group of businesses that have been identified? Or does it encompass something like this where FinCEN has made it a finding of necessity, which I think is very flawed, but setting that aside, a finding necessity for a zip code for an entire geographic region. And what Judge San Martino found, I think correctly, is that if you look at the statute, the statute has multiple indicia that it anticipated party-specific findings. And, you know, the reason that that, I think, goes, is related to the Fourth Amendment issue, is that that essentially reads the statute to require something that is more particularized and therefore more in line with the Fourth Amendment in this area. You know, in terms of the statutory, the clues essentially that suggest that that's the correct interpretation, you know, one is just the use of the word order, which is a word that brings the sort of APA soil with it. And we know that, you know, terms that are used in the APA bring that APA soil from cases like R.J. Reynolds from the Supreme Court. You know, the word order means something that is party-specific. That's what it means in the APA. We also know it from the provision for confidentiality in Section 5326 that says that GTOs are presumptively confidential. So, you know, something, an order that is directed to a particular party can be held confidential because it can be confidentially served on that party. But something rule-like, like this GTO, cannot by its nature be confidential because you have to publish it so that people can know about it and then determine if they have to comply with it. And so that's why this was published in the Federal Register, which, you know, rules typically are published in the Federal Register. Does it make sense for Congress to require a notice of comment rulemaking for an agency action limited to 180 days? Has there ever been one for less than a year that you can think of? That's an interesting question, Your Honor, not that I can think of off the top of my head. You know, obviously, there are rules that are for years all the time, like, you know, CAFE standards for automobiles are often for a year. We cite in our brief, yeah. Less than a year. You know, I can't think of one, but, you know, what I would say, Your Honor, is I think this goes to the Ultra-Viris point, which is that they anticipated something that would be, that would not require notice and comment. What Congress anticipated was that a GTO would be in order. It would be in order within the meaning of the APA, and, therefore, it wouldn't require notice and comment. I don't think they anticipated that you'd have these rule-like GTOs that are so expansive and then that should require notice and comment. The other sort of practical point I'd make is that these GTOs, especially the sort of rule-like GTOs, like this one, but also the real estate GTO, there was a real estate GTO that was first issued in 2016 and then was renewed every year for the next nine years until, in 2025, it was finally turned into a final rule, into a rule for the entire country. And every time it was renewed, they just expanded the jurisdictions that it applied to. And we're seeing this going down exactly the same path, where they've renewed it and they've expanded it so that the September GTO applies to Arizona as well as to Texas and California. Does that make it better? No, it doesn't make it better, and I think it actually, what it shows is that this is a way for the agency to get around the requirement of notice and comment and that it's not just something that's in place for 180 days. These GTOs can be in place for nine years, as in the case of the real estate GTO. It just seems that it's a difficult thing to know whether we should invest in software, for example. If you think, oh, I can ride this out for 180 days and it might hurt my business, but I can weather that. But if you're going to be doing this for 10 years, then you might say, oh, I need to get the software and amortize that over time. It makes it difficult to make a business decision about how to approach the problem. Absolutely, and I think having notice and comment for something that is rule-like like this would provide a much more structured framework around it. It also would provide that kind of notice for people. They would know if it's going to be in place for nine years, then we would know that, rather than having to guess, will this or will this not be renewed. Let me know if I'm getting this wrong, but the notice and comment point and the ultra-virus point, I sort of think of those as two different things. I think your ultra-virus argument is the way this thing is structured is outside the parameters of the statutory authorization because of all its rule-like attributes. Because a rule like that would have to be subject to notice and comment, what is foreseen by the statute is an order, which is not a notice and comment issue. You wouldn't have notice and comment for a genuine order, would you? I think that's well put, Your Honor, and I think that's what I'm trying to say. A notice and comment is not a straight-up notice and comment. It's an illustration of why it's ultra-virus. Yes, I think that's right. I think that if this was not ultra-virus, it would be an order, and it would not require notice and comment. Because it wouldn't make sense given the time parameters for an order and given that it's focused on this particular group of businesses. It wouldn't make sense to have a notice and comment, and it's confidential. Why would you have notice and comment? Yes, exactly. One thing I would say is the agency itself in 1989, just slightly a few years after the GTO statute was adopted, had a rulemaking where it talked about how this is all going to work, and it said they're going to be confidential, they're going to be served directly on the CEO of the particular business that's going to be identified, and then we're going to have a point person at the agency, and they're going to call up the business, and they're going to say, hey, how can we work with you to make this minimally intrusive for you? It was envisioning this kind of very specific particularized order that would be served, directed at, and served on a particular business, which is what the statute also contemplates. And so the agency itself read this exactly like we do right after the statute was directed. It's just that the agency adopted it, and the agency's interpretation has drifted over time as they've used the GTO mechanism to circumvent the APA's procedural requirements. How is this different from the New York GTO? So the New York GTO was directed at particular identified money service businesses. It was just a dozen or so of them, and it was directed at those businesses based on particular findings, that those businesses were a conduit for money laundering to Columbia. It was then directed at a particular class of transactions. It was transfers. So I think what I'd want to know if that was before me is, was there really a record for each of those businesses? How particularized were these findings? But I think it was certainly different from this GTO in the sense that it was much more directed. Yes, and based on particular suspicion, and also it was directed at particular types of transactions. It was money transfers from those businesses, through those businesses, to Columbia. More like a warrant. Significantly more, yes. Significantly more a warrant or a subpoena, whereas here we have something that is just so broad and so suspicionless. When you said that the district court is not proceeding, is that the district court's own doing, or did we do something to cause that? You did not do anything to cause that. The district, the government moved to stay in the district court pending this preliminary injunction appeal. We opposed that, and it was entered over our opposition. And I think, you know, even if there was any question, and I don't think there's any question about the proper scope of preliminary relief, I think the proper scope of final relief would be vacatur, which is why we have always been trying to push these cases to a final judgment so that we can resolve this. I think, obviously, everybody is now waiting for this court's guidance as to the issues that were resolved at the preliminary injunction stage. No? Thank you, Your Honors. Thank you, Your Honor. Just three quick points I'd like to make, and I promise one of them is vacatur. The first, just on the Fourth Amendment issue, my friend brought up that the Supreme Court described the information at issue as sufficiently described and limited in nature. As we mentioned in our briefs, the exact same information, putting aside the issue of the transactions to which it applies, is at issue here. You'll see in the record there is a description of the information solicited by CTR, and that matches exactly how the Supreme Court described the CTR in effect in the 70s. Insofar as my friend understands, Schultz, to include a language about unduly burdensome, I think, was the phrase to use. I'm not saying he's quoting directly, but I'll just say that that language does not appear, nor does the concept of burden more generally, and so we think that that consideration is secondary to the extent it's relevant. Second point, on the ultra-virus notion of party-specific findings, my judge referenced Judge San Martino's decision from the Southern District of California. I think the strongest—I understand the primary contextual argument to be that there's a provision for confidentiality. I think it's important to read to the end of that sentence, which says that confidentiality can be waived, exactly as it was here. Congress clearly contemplated there would be times when orders should be confidential, presumptively so, perhaps given the agency's past practice, but that it was not in any way binding the agency to proceed confidentially. I think, moreover, insofar as we're looking at the text, there's not really great reasons that I hear not to read the businesses to which the GTO applies as a group of businesses, which is what the statute says, or again, group of domestic financial institutions. Indeed, my friend makes a lot of the fact that there are 30 different ZIP codes. There are thousands of ZIP codes in the United States, and the fact is that the Treasury did proceed, FinCEN did proceed, with some particularity in the areas it was looking at. Finally, Your Honor, on VCDR, I think there's no need to reach the issue, first and foremost. I take my friend's point that they asked for universal relief, but asking for it is not the same as saying the APA demands it. Indeed, they cited a case saying that relief can be tailored. The district court tailored the relief. I think, separately, the district court's decision was not based on the APA, so putting, you know, the district court mentioned CASA forthcoming, and then did not purport to act under 5 U.S.C. 705. Your Honor, I think, ultimately, you know, the scope of injunctive relief that's granted is discretionary. I don't take these issues that I've raised to go to the court's jurisdiction, and I think, ultimately, the court could leave that issue, given the way it was raised below. If there are no further questions, we'd ask that the preliminary injunction be vacated. Thank you. I appreciate the arguments on both sides. It's very helpful. The court will stand in recess, according to the usual rule. Thank you. Thank you. Thank you.